UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY ALLEN
HEMINGWAY,

            Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

            Defendant.
_____/

Case No. 2:14-cv-12184
District Judge Laurie J. Michelson
Magistrate Judge Anthony P. Patti

## RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 19) AND TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 15)

**I.**     **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Defendant's motion for summary

judgment (DE 19), **DENY** Plaintiff's motion for summary judgment (DE 15), and

**AFFIRM** the Commissioner's decision.

**II.**     **REPORT**

      Plaintiff, Jeffrey Allen Hemingway, brings this action under 42 U.S.C. §§

405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social

Security  ("Commissioner") denying his applications for social security disability

insurance benefits and supplemental security income.  This matter is before the

United States Magistrate Judge for a Report and Recommendation on Plaintiff's

motion for summary judgment (DE 15), the Commissioner's memorandum in opposition and cross motion for summary judgment (DE 19), and the administrative record (DE 11).

### A.    Background

Plaintiff protectively filed his application for disability insurance benefits on November 26, 2012 and for supplemental security income on December 5, 2012, alleging that he has been disabled since October 1, 2012, at age 42.  (R. at 164-176.)  Plaintiff's applications were denied and he sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  ALJ Regina Sobrino held a hearing on January 2, 2014 and subsequently determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 10-63.)   On April 3, 2014, the Appeals Council denied Plaintiff's request for review.  (R. at 1-4.)  ALJ Sobrino's decision became the Commissioner's final decision.  Plaintiff then timely commenced the instant action.

### B.    Plaintiff's Medical History

Plaintiff presented to the Hurley Medical Center on December 14, 2005, following a car accident on October 24, 2005.  (R. at 273.)  The consulting physician noted that Plaintiff's MRI was negative, except for Arnold-Chiari Type I malformation.  Plaintiff underwent a brain MRI on November 3, 2005, which was unremarkable.  (R. at 283-84.)  On March 13, 2007, Plaintiff saw D.V. Pasupuleti,

M.D., FACP., FAANEM.  Upon examination, Dr. Pasupuleti noted that his findings were "commonly seen in clinical conditions like degenerative joint disease, disc disease, facet disease, osteophytes, spondylosis, spondylolisthesis, and/or stenosis.  (R. at 278.)  He described Plaintiff as pleasant and cooperative.  (R. at 279.)  Dr. Pasupuleti noted a positive straight leg raise and strength within normal limits.  (Id.)

Plaintiff underwent an electromyographic study on March 3, 2008, which revealed evidence of carpal tunnel syndrome and bilateral L4 radiculopathies.  (R. at 287.)  On April 2, 2008, he underwent an MRI of the lumbar spine, which was overall stable, demonstrating a "small right foraminal/far lateral disc protrusion at L4-L5 without evidence of compression," and other mild spondylitic changes of the lumbar spine.  (R. at 288-290.)

On October 14, 2008, Plaintiff saw Mazhar Zaidi, M.D. at the Hurley Family Health Center ("Hurley"), for his back pain, which he reported as ten out of ten.  Upon examination, Dr. Zaidi noted that Plaintiff sat on the examination table comfortably, but had a tremor of both upper and lower extremities. (R. at 281.)  Dr. Zaidi noted, however, that Plaintiff had smoked cigarettes for twenty years and had recently cut down to about three per day.  (R. at 280.)  Nathan Kopek, D.O., completed a progress note on November 10, 2008, which reported that Plaintiff

3

switched to the Genysis West Flint Health Center because Hurley "stopped prescribing this patient's narcotic medication."  (R. at 282.)

On January 26, 2010, Plaintiff saw neurologist Faisal I. Ahmad, M.D., for a neurological follow-up visit, after not being at the facility seen for a year.  (R. at 301.)  He complained of knee and lower back pain, as well as forgetfulness.  Dr. Ahmad resumed Plaintiff's Neurontin and prescribed tramadol as needed.  Plaintiff underwent a normal EEG on February 18, 2010.  (R. at 300.)  On February 25, 2010, however, Plaintiff reported to Dr. Ahmad that he had passed out two days before and his pain was a 9/10.  (R. at 298.)  Dr. Ahmad adjusted his medication and started Plaintiff on Darvocet.  Plaintiff had a follow-up visit on November 9, 2010, during which he reported sharp pain in his low back, as well as neck and upper extremity pain.  (R. at 292.)  Dr. Ahmad performed trigger point injections on this date and again on February 8, 2011.  (R. at 291-92.)  On January 10, 2012, after complaining of chest pain, Plaintiff underwent a chest CT, which revealed no evidence of rib fracture.  (R. at 313-14.)

On September 20, 2012, Plaintiff presented to Michigan Pain & Rehab with complaints of neck and back pain following an automobile accident.  (R. at 323.)  Allan Vrable, D.O., FAAPMR, assessed Plaintiff's previous EMG as abnormal, noting that there was evidence for motor peroneal neuropathy in the left ankle.  (R. at 324.)  One day later, Dr. Vrable noted that Plaintiff had normal muscle tone in

the upper and lower extremities, with strength of 5/5 bilaterally in the upper extremities.  (R. at 333.)  He further noted that Plaintiff "concentrates well and is not easily distracted."  (Id.)  Dr. Vrable found positive spasming and tenderness in his lower back and neck.  On November 21, 2012, however, Rodney Shaw, D.O., reported that Plaintiff claimed that he had not been keeping his appointments due to his pain.  (R. at 335.)

Plaintiff saw Samer Saleh, M.D. at Hurley, on April 4, 2012.  Dr. Saleh noted that Plaintiff reported constant and gradually worsening pain in his lumbar spine.  (R. at 349.)  Upon examination, Dr. Saleh found normal range of motion in his neck and musculoskeletal region.  (R. at 350.)  On June 28, 2012, however, Plaintiff again presented to Hurley.  The record from the visit states that Plaintif "brought a script that he was on narcotics in 2008 and was demanding for us to prescribe it again.  He didn't appear in much pain."  (R. at 356.) He was examined and found to have a normal range of motion.  Plaintiff was assessed with pain medication seeking behavior and arthralgia.  (R. at 356.)  On December 20, 2012, Plaintiff was again seen at Hurley, reporting chronic back pain, but denying radiation, numbness, or tingling.  (R. at 361.)  He exhibited musculoskeletal tenderness, but was again assessed as pain medication seeking.  (Id.)

On January 14, 2013, Plaintiff completed a function report.  (R. at 218-339.) Plaintiff reported that he had severe pain following a car accident, which cracked

his tailbone.  (R. at 218.)  He noted that his pain affects his sleep because his legs are restless, he cannot lie on his back, and he has to wear braces.[1]  (R. at 219.)  He also reported that he needed help attending to his personal care and that his memory was "not what it was."  (R. at 219-220.)  He indicated that he prepared his own simple meals one to two times per day, and did some housework with help.  (R. at 220.)  Plaintiff further reported that he goes outside in the summer and shops with his fiancée.  (R. at 221.)

### C.   Hearing Testimony

#### 1.   Plaintiff's Testimony

At the January 2, 2014 administrative hearing, Plaintiff testified that he lives with his fiancée Jamie.  (R. at 14 and 20.)  Plaintiff testified that he cooks, cleans, and does laundry with help, and that he shops for groceries when he can, but noted that Jamie does most of the work.  (R. at 17 and 20.)  He indicated that he has no trouble bathing or dressing and that he drives a car locally.  (R. at 17.)  Plaintiff went to school through the eighth grade and did not obtain a GED, but knows how to read, write, and do some addition and subtraction.  (R. at 14.)  Plaintiff indicated that his past work was as a home health care provider.  (R. at 25.)  He noted that the position involved a lot of moving and lifting, which either caused or worsened

---

[1] There is no medical record supporting his alleged need to wear braces, and they were not prescribed by a doctor.

his back and rib pain.  (R. at 26.)  Plaintiff testified that he could not work anymore because he was in too much pain.  (R. at 15.)

Plaintiff indicated that he had been diagnosed with scoliosis, peripheral neuropathy, left shoulder tendinitis, carpal tunnel syndrome, Arnold Chiari type-1 malformation, and possible fibromyalgia.  (R. at 45-46.)  Plaintiff testified that he could stand for five to ten minutes before needing to sit down, could sit for a half hour before needing to change positions, and could not walk through an entire supermarket.  (R. at 15.)   Plaintiff also noted that the end of his tailbone was "chipped," which causes him problems when sitting.  (R. at 30.)  When he goes grocery shopping, he uses a motorized scooter.  (R. at 28.)  He noted that after twenty or thirty minutes of standing, his knees start to ache.  (R. at 22.)  He indicated that, although not prescribed by a doctor, he has used a cane and knee braces.  (R. at 15.)  Plaintiff noted that he could lift about a gallon of milk, but that his hands shook when he tried to hold a pen or pencil.  (R. at 16.) Plaintiff testified that he had trouble reaching, bending at the waist, and bending his knees.  (R. at 16.) Plaintiff also testified to problems with carpal tunnel, for which he wore wrist splints.  (R. at 26-27.)

Plaintiff testified that he was not taking any medication at the time of the hearing because his prescriptions ran out and he was not able to get them refilled.  (R. at 18.)  He clarified that the reason he could not refill the prescriptions was

7

because he lost his health insurance and could not afford the refills.  (R. at 24-25.)
Plaintiff further noted that he would like to receive medical treatment, but that he
could not afford it.  (R. at 25.)  He testified that:

> I was on a Genesee health plan, then I got a caseworker that gave us a
> lot of trouble, and he's the one who kicked me off of it.  I tried to get
> back on that and then they, they gave me some kind of ruling where I
> couldn't, you know, get back on it and I don't know why, but I would
> like to be back on it.

 (R. at 32-33.)

Plaintiff testified that he has neck pain and headaches, but that he is unable
to seek medical attention because of his lack of insurance.  (R. at 28.)  Plaintiff
testified that he used to have a good memory, but now cannot "remember much of
anything."  (R. at 29.)  He indicated that it would be difficult for him to remember
a simple list or to do an "easy job" for 40 hours per week.  (R. at 29-30 and 32.)

During a normal day, Plaintiff wakes at one or two in the afternoon, dresses
in shorts and a tee shirt or his pajamas, lets his dog out, then sits in his chair and
watches television all day, with breaks to switch positions related to the pain.  (R.
at 21-22.)  When Plaintiff needs to lie down, he does so in his bed for one to two
hours and puts a heating pad on his lower back.  (R. at 23-24.)  Plaintiff testified
that he sleeps odd hours, but generally gets six to seven hours of sleep per night.
(R. at 20.)  He noted that the pain makes it difficult for him to fall asleep but that
he can "just take some Tylenol and go to bed, or Nyquil . . . ."  (R. at 21.)

8

## 2. Vocational Expert Testimony

Mary Everts testified as the Vocational Expert ("VE") at the administrative hearing. (R. at 33-46.) The ALJ asked the VE to determine if there were any positions in the national economy that a hypothetical person of Plaintiff's age, and education, with no past relevant work, could perform work with the following limitations:

> [The hypothetical individual is] limited to sedentary work, as that term is defined in the Social Security Regulations and the Dictionary of Occupational Titles; in addition, assume a person who should not need to climb [] ladders, ropes, or scaffolds; should not need to kneel or crawl; can only occasionally climb stairs, balance, stoop, and crouch, assume a limitation to frequent handling, fingering, and feeling; there should be no exposure to hazards or vibrations; the person should not have to operate foot or leg controls.

(R. at 34-35.) Based on this hypothetical, the VE identified three sedentary unskilled positions with a specific vocational preparation of 2: packer, with 70,000 positons nationally; inspector, with 13,000 positions nationally, and information clerk, with 85,000 positions nationally. (R. 35.) [2]

Next, the ALJ asked the VE to consider if these jobs would be available to the above hypothetical individual, who was also limited to simple, routine,

---

[2] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." SSR 00-4P.

repetitive work, that is not done at a production-like pace, "[f]or example, no assembly line work, and with only minimal changes in the work setting . . . ."  (R. at 35-36.)  The VE answered that the three positions identified would be available to the hypothetical individual.  The ALJ then asked whether the positions would be impacted if the above individual would also need to alternate positions for up to five minutes approximately every thirty minutes, to which the VE responded that all three positions would remain available.  The VE clarified that the hypothetical individual would be required to perform work duties eight hours a day, five days per week (or the equivalent), and missing more than one day per month would be work preclusive.  (R. at 36.)

Upon questioning from Plaintiff's counsel, the VE testified that the need to lie down every other day for one to two hours would be work preclusive, as would the need to be off task more than 20% of the day.  (R. at 37-38.)  Plaintiff's counsel then explored the VE's expertise as a vocational rehabilitation counselor.  The VE testified that she had an understanding of the types of positions that exist in the community where she practices, but gave only national jobs numbers.  (R. at 39.) The VE indicated that she did not have training, education, or work experience in calculating jobs numbers, and that she used the Employment Quarterly from "U.S. Stat Publishing" as her source for the numbers given above.  (R. at 40-42.) According to the VE, this document is compiled from the census, and the numbers

are determined by assigning a certain number of jobs to each standard occupational

classification ("SOC") code, assigning several Dictionary of Occupational Titles

("DOT") codes to each SOC code, and dividing the total number of jobs under the

SOC code by the number of DOT codes.  (R. at 42-43.)  The VE then testified that

she was not sure which of the above positions would be available on a part-time

basis.

### D.  THE ADMINISTRATIVE DECISION

On January 17, 2014, the ALJ issued her decision.  (R. at 51-59.)  At Step 1

of the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a
five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).
Although a dispositive finding at any step terminates the ALJ's review, *see Colvin
v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential
review considers and answers five questions:

1.   Is the claimant engaged in substantial gainful activity?
2.   Does the claimant suffer from one or more severe impairments?
3.   Do the claimant's severe impairments, alone or in combination, meet
     or equal the criteria of an impairment set forth in the Commissioner's
     Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.   Considering the claimant's residual functional capacity, can the
     claimant perform his or her past relevant work?
5.   Considering the claimant's age, education, past work experience, and
     residual functional capacity, can the claimant perform other work
     available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th
Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

in substantially gainful activity since his alleged onset date of October 1, 2012.  (R. at 53.)

At Step 2, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease, osteoarthritis, fibromyalgia, and carpal tunnel syndrome.  (Id.)

At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 53-54.)

Prior to Step 4 of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC")[4] and determined that Plaintiff had the capacity to perform sedentary work except with the following limitations:

> no climbing of ladders, ropes, or scaffolds; occasional climbing of stairs, crouching, stooping, and balancing; no kneeling or crawling; frequent handling, fingering, and feeling; no exposure to hazards or vibration; and no use of foot or leg controls.  The cla[i]mant should also be able to wear wrist splints while working.

(R. at 54.)  The ALJ further noted that Plaintiff had no past relevant work.  (R. at 58.)

---

[4] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

At Step 5, the ALJ concluded that Plaintiff was capable of performing other jobs that exist in significant numbers in the national economy.  (R. at 58.)  She therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 59.)

### E.   STANDARD OF REVIEW

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007);

13

*Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."). Furthermore, the claimant "has the ultimate burden to establish an entitlement to benefits by proving the existence of a disability." *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

14

## F.  ANALYSIS

In his motion for summary judgment, Plaintiff asserts four statements of error.  First, he contends that the ALJ inappropriately drew inferences about his symptoms because he was too poor to pay for treatment.  Second, Plaintiff argues that the ALJ erred by using boilerplate language in her credibility assessment. Third, Plaintiff challenges the ALJ's reliance on the VE's testimony, which he contends "lacked foundation."  (DE 15 at 9.)  Finally, Plaintiff argues that the ALJ erred by failing to address all of Plaintiff's impairments at Step 2. The Commissioner opposes Plaintiff's motion, asserting that she is entitled to a grant of summary judgment because substantial evidence supports the ALJ's conclusions.  I will address each argument in turn.

### 1.    The ALJ Properly Articulated and Assessed Plaintiff's Credibility

Plaintiff argues that the ALJ erred in two ways in her credibility assessment: 1) by making improper inferences about Plaintiff's impairments based on his inability to pay for medical treatment; and 2) by using boilerplate language that did not indicate what evidence the ALJ considered in determining whether Plaintiff's complaints were credible.  The Commissioner counters that the ALJ appropriately followed the regulations with respect to Plaintiff's inability to obtain treatment and that she provided sufficiently specific analysis of his credibility to explain why his

15

subjective complaints could not be fully credited.  I agree with the Commissioner for the reasons addressed below.

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue,* 263 F. App'x 469, 475 (6th Cir. 2008); *see also Beavers v. Sec'y of Health, Ed., and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) ("The opportunity to observe the demeanor of a witness, evaluating what is said in the light of how it is said, and considering how it fits with the rest of the evidence gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly.").  "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 469, 475 (6th Cir. 2007).  Nevertheless, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters v. Comm'r Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters,* 127 F.3d at 531; *see also Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 863 (6th Cir. 2011) ("Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating,

16

should have the opposite effect."). When assessing an individual's credibility, "the ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011). The ALJ made this finding here, concluding that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (R. at 56.)

Upon making such a finding, the ALJ must next "consider the entire case record" to "evaluate the intensity, persistence, and functional limitations of the symptoms considering objective medical evidence." 20 C.F.R. § 404.1529(c)(1-3); Soc. Sec. Rul. 96-7p. A non-exhaustive list of relevant factors to be considered by the ALJ include: 1) the claimant's daily activities; 2) location, duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of medication; 5) treatment, other than medication; 6) any measures the claimant uses or has used to relieve his or her pain or other symptoms; and 7) other factors concerning functional limitations and restrictions. *Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 474 (6th Cir. 2014); 20 C.F.R. § 404.1529(c)(1-3); Soc. Sec. Rul. 96-7p; *see also Ewing v. Astrue*, No. 10-cv-1792, 2011 WL 3843692, at *9 (N.D. Ohio, Aug 12, 2011) ("Social Security Ruling 96-7p requires such factors to be *considered*, not *discussed* . . . .")

(emphasis in original) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006)).  In his or her opinion, the ALJ must "provide a sufficiently specific explanation for his [or her] credibility determination so that it is clear to the individual and any subsequent reviewers the weight given to the individual's statements and the reasons for that weight."  *Malcolm v. Comm'r of Soc. Sec.*, No. 13-15188, 2015 WL 1439711, at *7 (E.D. Mich. Mar. 27, 2015) (citing *Soc. Sec. Rul.* 96-7, 1996 WL 374186, at *1 (July 2, 1997)).

### a.   The ALJ Appropriately Considered Plaintiff's Failure to Obtain Treatment in Light of His Inability to Afford Medical Care

"The Sixth Circuit recognizes that a claimant's failure to follow prescribed treatment is evidence supporting an ALJ's factual finding that the claimant's testimony was not fully credible."  *Lemle v. Comm'r of Soc. Sec.*, No. Civ.A. 11-10295, 2012 WL 1060111, at *9 (E.D. Mich. Jan. 27, 2012) *report and recommendation adopted*, No. 11-10295, 2012 WL 1069787 (E.D. Mich. Mar. 29, 2012) (citing *Sias v. Sec'y of Health & Hum. Servs.*, 861 F.2d 475, 480 (6th Cir. 1988)); *see also* S.S.R. 96-7p, 1996 WL 374186, at *8 (noting that "the individual's statements may be less credible if . . . the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.").  Pursuant to Social Security Ruling 96-7P, however, an ALJ may not draw:

> any inferences about an individual's symptoms and their functional
> effects from a failure to seek or pursue regular medical treatment
> without first considering any explanations that the individual may
> provide, or other information in the case record, that may explain
> infrequent or irregular medical visits or failure to seek medical
> treatment.

S.S.R. 96-7P. For example, the ALJ should consider the claimant's explanation

where the individual "may be unable to afford treatment and may not have access

to free or low-cost medical services." *Id.* Similarly, Social Security Ruling 82-59

provides that inability to afford treatment is a justifiable cause for failing to follow

prescribed treatment. S.S.R. 82-59; *see also McKnight v. Sullivan*, 927 F.2d 241,

242 (6th Cir. 1990) (agreeing with the conclusion that a "condition that is disabling

in fact continues to be disabling in law," when the claimant "cannot afford

prescribed treatment or medicine and can find no way to obtain it." (internal

quotations omitted)).

In the instant action, Plaintiff asserts that the ALJ erred in her conclusion

that Plaintiff was not fully credible because he did not comply with treatment in

September 2012, indicating that the reason for Plaintiff's non-compliance was his

inability to afford medical treatment. The ALJ, however, appears to refer to a

November 21, 2012 progress report, which states that Plaintiff "claims he hasn't

been keeping appointments because [he] has been in too much pain and basically

just stays at home in bed." (R. 57 and 335.) It is unclear when Plaintiff lost his

medical insurance. At the January 2, 2014 hearing, he testified that he had been

unable to refill his "most recent prescriptions." (R. at 24.) Additionally, the evidence in the record is dated through December 2012, indicating that Plaintiff had insurance in 2012. Although the ALJ mistakenly indicated that this record was from September 2012, it is fairly clear that the ALJ did not conflate Plaintiff's "sparse medical record" due to his financial troubles in 2013 and 2014 from a 2012 report that stated he missed appointments because he was in pain. (R. at 56-57.)

Although Plaintiff asserts that the ALJ "did not acknowledge that Plaintiff could not treat due to his lack of financial ability to pursue treatment," she did, in fact, address just that. (DE 15 at 6.) Specifically, the ALJ stated the following:

> Treatment since the alleged onset date of disability is sparse. Where an individual has not received ongoing treatment despite the evidence of a severe impairment, the current objective medical evidence and other available evidence must be evaluated, taking into consideration the individual's medical history, symptoms, and medical source opinions.

(R. at 56.) The ALJ also noted that Plaintiff was kicked out of his Genesee County health plan and went on to analyze "the medical evidence *that is of record*," which included the treatment note at issue. (R. at 57) (emphasis added.) Finally, as addressed below, the ALJ provided sufficient reasons to discount Plaintiff's credibility, of which his failure to show up for appointments was only one.[5]

---

[5] Other reasons included inconsistencies between Plaintiff's responses to a January 2013 Function Report and his reported activities of daily living, along with objective medical evidence in the record demonstrating that Plaintiff was neurologically intact. The Undersigned cannot help but notice the repeated

Accordingly, the ALJ did not err with respect to her credibility assessment on this point.

### b.      The ALJ's Use of Template Language

Plaintiff's second credibility argument is also unavailing.  Specifically, he asserts that the ALJ failed to provide a sufficiently specific explanation for discounting Plaintiff's credibility by using the following template language:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments would reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(DE 15 at 6-7, quoting R. at 56.)  As support for this position, Plaintiff cites at length to *Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012), which rejected the above-cited language as incapable of informing a reviewer "of the specific evidence the ALJ considered in determining that the claimant's complaints were not entirely credible." *Id.* at 645.

---

medical record references to Plaintiff's narcotic seeking behavior (R. at 356 and 361), his "demanding" narcotics based on a four-year old prescription (R. at 356), his switching health systems because the previous one "stopped prescribing this patient narcotic medication," (R. at 282), and his being kicked off of the Genesee Health Plan by a "case worker [who gave him] a lot of trouble . . . ." (R. at 32). The ALJ properly went beyond all this information from which other inferences *could* be drawn—and did a thorough review of both the testimony and medical evidence related to the relevant period, grounding her opinion on objective data.

21

In analyzing the holding of *Bjornson*, the Sixth Circuit concurred that the language was "unhelpful and poorly worded," but clarified that the "chief concern with the popularity of this template . . . is the risk that an ALJ will mistakenly believe it is sufficient to *explain* a credibility finding, as opposed to merely introducing or summarizing one." *Cox v. Comm'r of Soc. Sec.*, No. 14-6243, 2015 WL 3621451, at *5 (6th Cir. June 11, 2015) (emphasis in original). The court in *Cox* therefore went on to remand the case because the ALJ "did not articulate any reason for discrediting Appellant's testimony," and the "only explicit reference to Appellant's credibility consisted of the boilerplate quoted above." *Id.* Similarly, this District has rejected the template language only "where the ALJ used the boilerplate language 'without linking the conclusory statements contained therein to the evidence in the record or even tailoring the paragraph to the facts at hand . . . .'" *Isaac v. Comm'r of Soc. Sec.*, NO. 12-cv-13324, 2013 WL 4042617, at *14 (E.D. Mich. Aug. 9, 2013) (quoting *Bjornson*, 671 F.3d at 645); *see also Tell v. Comm'r of Soc. Sec.*, No. 11-cv-15071, 2012 WL 3679138, at *10 (E.D. Mich. July 13, 2012) *report and recommendation adopted*, No. 11-cv-15071, 2012 WL 3543273 (E.D. Mich. Aug. 16, 2012) (noting that the template language was "unhelpful," and remanding because the ALJ's two-paragraph credibility assessment was beyond meaningful appellate review).

22

Here, the ALJ provided a sufficiently specific explanation for her credibility determination, and linked the template language to the evidence in the record, pursuant to the rule.  Directly before the boilerplate language at issue, the ALJ summarized Plaintiff's responses to a January 2013 Function Report, as well as his hearing testimony.  (R. at 55.)   Following the boilerplate, there are six paragraphs devoted to discussing the objective medical information in the record related to Plaintiff's complaints of pain. The ALJ then stated that Plaintiff's "allegations of disabling symptoms are not fully substantiated," and points to Plaintiff's failure to comply with treatment in September 2012, his activities of daily living, including driving, preparing meals, doing housework, and shopping as reasons do discount his credibility.  (R. at 57.)  In addition, the ALJ pointed to objective evidence that Plaintiff is neurologically intact, but *nevertheless agreed with Plaintiff* that evidence of his neuropathy and restricted range of motion are reasons to limit him to sedentary work.  Finally, the ALJ gave significant weight to the opinion of the State Agency physician, who opined that Plaintiff could perform work consistent with the RFC.  (Id.)

Furthermore, the ALJ expressly stated that she complied with Social Security Rule 96-7p, which requires her to consider a non-exhaustive list of factors in determining credibility.  (R. at 125.)  There is no indication that she failed to do so.  *See, e.g.*, *Malcolm*, 2015 WL 1439711 at *8 (concluding that, in light of the

Court's deferential approach to credibility assessments, the ALJ's express statement of compliance was persuasive).  Social Security Rule 96-7p, in accordance with 20 C.F.R. § 404.1529, requires the ALJ to consider the claimant's activities of daily living.  As addressed above, the ALJ did just that, and included such consideration in her credibility determination.

The ALJ is also required to consider details about the claimant's pain, aggravating factors, type and effectiveness of medication, other measures to relieve pain, and any other relevant factors.  Soc. Sec. Rul. 96-7p.  Here, as further evidence that the ALJ considered the relevant factors, she summarized the responses in Plaintiff's Function Report, in which he noted that he was in severe pain, that he used a wheelchair, that he took prescribed medications, and prepared meals, performed three hours of housework per week with help, and shopped in stores.  (R. at 55.)  In addition, she summarized his testimony that he had difficulty with memory, that his pain made it difficult for him to fall asleep, and that he had no trouble bathing or dressing.  (Id.)  She noted that Plaintiff used a wheelchair, cane, and brace/splint in order to relieve the pain.  (Id.)  The ALJ therefore provided a sufficiently specific explanation for her credibility determination, and Plaintiff has failed to demonstrate that the adverse-credibility finding was not supported by substantial evidence.

### 3.   The ALJ's Reliance on the VE's Testimony is Supported By Substantial Evidence

When, as here, an ALJ concludes that a claimant does not have the RFC to perform his or her past relevant work at Step 4, the burden shifts to the Commissioner at Step 5 to show that Plaintiff "possesses the capacity to perform other substantial gainful activity that exists in the national economy." *Varley v. Sec'y of Health & Hum. Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). This requires the Commissioner to "make a finding supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002) (internal citations omitted). Such substantial evidence "may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only if the question accurately portrays [the claimant's] individual physical and mental impairments." *Id.*

Here, Plaintiff does not challenge any of the hypothetical questions asked of the VE, but argues that the VE's testimony lacked foundation. Specifically, he takes issue with the VE's reliance on the Employment Quarterly from U.S. Publishing for jobs numbers. Plaintiff asserts that the method used by Employment Quarterly "has no basis for producing a reliable number of jobs for a sample DOT given by the vocational expert." (DE 15 at 10.) Plaintiff does not cite to any case law for this proposition.

Defendant counters that this district has already dealt with Plaintiff's challenge to Employment Quarterly, which it described as a publication "derived from government sources." *Swincki v. Astrue*, No. 07-13596, 2009 WL 728544, at *19 (E.D. Mich. Mar. 19, 2009). The court concluded that "[t]he reliability of government publications is not subject to challenge because the agency already has taken administrative notice of the reliability of job information from government publications." *Swincki v. Astrue*, No. 07-13596, 2009 WL 728544, at *19 (E.D. Mich. Mar. 19, 2009) (citing 20 C.F.R. § 416.966(d), which provides that when the Commissioner determines that "unskilled, sedentary, light, and medium jobs exist in the national economy (in significant numbers either in the region where you live or in several regions of the country), [she] will take administrative notice of reliable job information available from various governmental and other publications.").

Plaintiff does not address the *Swincki* holding, and although it is not binding upon this Court, I find the reasoning persuasive. As further addressed by the Fourth Circuit, requiring a VE to produce job statistics specific to the DOT-coded occupations makes it "unlikely that the Commissioner would <u>ever</u> succeed in satisfying her burden," which "cannot be the result the regulations intend." *Guiton v. Colvin*, 546 F. App'x 137, 142 (4th Cir. 2013) (emphasis in original). The ALJ

in this case reasonably relied on the VE's testimony, which was in turn based on a reliable government publication; therefore, she did not err at Step 5.

### 4. The ALJ's Step 2 Finding is Supported by Substantial Evidence

Pursuant to 20 C.F.R. § 404.1520, at Step 2 the ALJ must "consider the medical severity of [the claimant's] impairment(s)." 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ determines at Step 2 that the claimant does not have any severe impairments, the analysis ends and the claimant is found to be not disabled. Id. Here, the ALJ found severe impairments of degenerative disc disease, osteoarthritis, fibromyalgia, and carpal tunnel. (R. at 53.) She then went on to perform the remaining steps of the analysis.

In his final statement of error, Plaintiff argues that the ALJ "does not engage in any analysis about whether some of Plaintiff's conditions . . . constitute severe medical impairments." (DE 15 at 11.) Specifically, he asserts that the ALJ was required to engage in an analysis to determine whether *all* of Plaintiff's alleged impairments were severe. He does not develop this argument or cite to any case law or regulation to indicate that such a requirement exists. Nor does he point to evidence in the record to demonstrate that the remaining impairments of rib pain, headaches, memory deficiency, tailbone, forearm, scoliosis, peripheral neuropathy, left shoulder tendinitis, Arnold Chiari type-1 malformation, and chest wall pain constitute severe impairments.

As Defendant contends, even if the ALJ *was* required to engage in such an analysis with respect to all of Plaintiff's impairments, her failure to do so was harmless error. The Sixth Circuit has provided that, even if an ALJ erred by not including additional severe impairments at Step 2, "the error is harmless as long as the ALJ found at least one severe impairment and continued the sequential analysis and ultimately addressed all of the claimant's impairments in determining her residual functional capacity." *Swartz v. Barnhart*, 188 F. App'x 361, 368 (6th Cir. 2006). Accordingly, the "critical issue on appeal is simply whether substantial evidence supports the ALJ's [RFC conclusions]." *Id.*

Here, substantial evidence does support the ALJ's RFC conclusions. The ALJ limited Plaintiff to sedentary work, with exertional limitations and the requirement that he be able to wear wrist splints when working, to account for his physical impairments. Evidence in the record demonstrates normal physical examinations, as well as evidence of neuropathy and restricted range of motion, which led the ALJ to limit Plaintiff to sedentary work. (R. at 57-58, 350, and 356.) The only evidence in the record of Plaintiff's memory problems was his own subjective self -reports, which the ALJ discounted as addressed above. Accordingly, Plaintiff has failed to demonstrate that the ALJ erred at Step 2 of her analysis.

## G.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment, **GRANT** Defendant's motion for summary judgment, and **AFFIRM** the Commissioner of Social Security's decision.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and

29

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," *etc.*  If the Court determines that any objections are without

merit, it may rule without awaiting the response.


Dated: July 13, 2015                 s/Anthony P. Patti
                                     Anthony P. Patti
                                     UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record
on July 13, 2015, and/or by U.S. Mail.

                                     s/Michael Williams
                                     Case Manager to the
                                     Honorable Anthony P. Patti